Filed 2/18/14  In re M.M. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MEGAN M.,<br><br>    Defendant and Appellant. | A139017<br><br>(Contra Costa County<br>Super. Ct. No. J11-01662) |

Appellant Megan M. (mother) appeals the juvenile court's order terminating parental rights to her daughter, M.M. (minor), following a permanent placement hearing held pursuant to Welfare and Institutions Code section 366.26.[1]  Mother contends the termination of parental rights would be detrimental to minor because of their parent-child relationship (§ 366.26, subd. (c)(1)(B)(i)).  We disagree and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Contra Costa County Children and Family Services Bureau (Bureau) filed a section 300 dependency petition in December 2011 alleging mother was unable to properly care for her four-year-old daughter due to alcohol abuse.  The detention/jurisdictional report recommended the minor remain out of the home until

---

[1] Further statutory references are to the Welfare and Institutions Code.

1

mother receives treatment for her alcohol addiction. The Bureau's February 2012 disposition report stated: Minor is currently placed in the home of a relative in Contra Costa County. In a prior dependency petition filed on behalf of the minor in July 2007, the court sustained an allegation mother could not care for the minor due to chronic substance abuse; mother successfully completed her case plan, reunified with minor and that case was closed in October 2008. Mother readily acknowledges she has an alcohol problem and stated she again began drinking frequently in 2011. Her family encouraged her to participate in counseling and she attended a few sessions. In December 2011, mother's maternal aunt went to the home to check on mother, found her intoxicated and argumentative, and called the police. Minor was detained on December 13, 2011. Mother began drug testing and participating in the New Connections outpatient program. On January 17, 2012, mother was arrested for public intoxication outside the residence of her former boyfriend. Mother began attending an outpatient program on January 31, 2012. The minor is currently placed with her maternal aunt and is very comfortable there. The Bureau recommended reunification services for mother.

At the dispositional hearing on February 9, 2012, minor's counsel argued mother should be ordered to an inpatient treatment program. Mother's counsel argued the court should follow the Bureau's recommendation of outpatient treatment so that mother could continue in her full time job, which provided her and the minor with health benefits. The court adopted the Bureau's recommendations, but warned mother that if she tested positive she would be ordered into residential treatment. The record shows mother was hospitalized at a medical center in early May 2012 with a blood-alcohol level of 0.39. The court ordered mother to an inpatient treatment program on May 15, 2012.

In connection with the six-month review hearing set for September 13, 2012, the Bureau social worker prepared a status report dated July 27, 2012. The social worker reported mother entered an inpatient alcohol treatment program in May and was on schedule to graduate from the program in mid-August. Mother has been regularly attending group activities and therapy during the program. Family members have been very helpful in ensuring minor visits her mother at the program facility and mother has

2

also arranged to be in telephone contact with minor.  The social worker opined that whereas mother willingly participates in services, she has not yet shown she can control her alcohol addiction for an extended period of time; also, much of mother's "focus appears to be centered on conflicts with her family and on her relationship with her boyfriend."  The Bureau recommended the minor remain in out-of-home placement with relative caregivers, mother continue to receive reunification services and the Bureau be authorized to approve overnight visits up to 30 days.  On September 13, 2012, the Bureau filed a supplemental report stating mother had been drinking on September 5, and that the Bureau supported the relative caregivers' request to be appointed de facto parents of the minor.

At the six-month review hearing on September 13, 2012, the court, without objection, appointed the relative caregivers as de facto parents.  The Bureau clarified it would only consider overnight visitation if mother maintains sobriety for over 90 days, and noted mother admitted to drinking on September 5, after she graduated from her recovery program.  Mother reported she was currently "back at my apartment working and going to [a treatment program]," and recently started going to AA meetings everyday.  The court rejected overnight visitation and set a further review hearing for December 13.  The court also advised mother she had "till January 10, 2013, to successfully reunify with your child" or the court would "set a permanent plan for your child."

The social worker prepared a status report dated December 6, 2012, stating: "[Mother] continues to struggle with her addiction to alcohol.  She was admitted to [the] hospital on October 18, 2012 due to excessive drinking.  After completing a seven-day detox at [a recovery center], she entered [a] residential program.  While there, her counselor [] and the undersigned social worker referred mother] to long term residential programs.  [Mother] stayed at [the recovery center] until mid-November.  After leaving, she resumed drinking and woke up one morning in an unfamiliar place in San Francisco, unable to recall how she arrived.  On or about December 3, 2012, [mother] entered a 12 to 15 month residential substance abuse program in Yuba City . . . .  [¶] [Mother's] safety

3

has been a great concern to the Bureau and to her family due to the level of her alcoholism. [Mother's] brother has searched for [her] on the streets of Walnut Creek and San Francisco during her binges. On one occasion, a stranger called the family from [mother's] cell phone to report that she was lying on a sidewalk outside of a bar in San Francisco. [Mother] has been hospitalized numerous times over the past few months after drinking in excess. The family has become divided over this issue, as some of them feel a need to conceal [mother's] drinking so that she will not lose custody of the child, and others feel a need to hold [mother] accountable."

In regard to the minor, the December 2012 status report states she has been staying "with her [d]e [f]acto parents, aunts Jennifer and Kelly, for approximately one year. Before she was detained, minor was already aware that her mother drinks, and that mother's behavior changes when she drinks. For the past year, [minor's] understanding has been that her mother is trying to get better, and that she would return to mother someday. At this point, [minor] must process the knowledge that the separation from mother is much more serious than she originally anticipated. [Minor] began sessions with [a child therapist] in early December, 2012." The status report also notes the current caregivers are willing to adopt the minor. Noting mother's "alcoholism is at a very dangerous level, and she is unable to provide a safe stable home for [minor]," the report recommends the court terminate mother's reunification services and set a section 366.26 hearing.

At the review hearing held on January 18, 2013, the social worker testified that mother acknowledged she'd had four near-death experiences related to alcohol intoxication, including one in May 2012, when she was admitted to the hospital with a 0.39 blood-alcohol level. Teen Challenge is the fourth alcohol recovery program mother has enrolled in during this dependency. Mother testified that she had completed the "blackout" period of the Teen Challenge program, during which she communicated with family members only by letter; she is now in the three-month-long "induction" phase, during which she is allowed one visit per month with persons on her contact list, including her daughter. According to mother, at Teen Challenge, unlike other programs,

4

she is learning to have faith and have a personal relationship with God.  Mother expressed her willingness to stay in the Teen Challenge program up to 12 months.  At the conclusion of the hearing, the court found there was not a substantial probability the minor could be returned to the mother's custody within the reunification period and set a section 366.26 hearing on May 9, 2013.

The Bureau's section 366.26 report states minor has been in placement with the de facto and prospective adoptive parents (a maternal aunt and her partner) since December 2011.  On a home visit by the social worker, minor was asked to draw a picture of her family and she drew "herself and her two aunties, Aunt Kelly and Aunt Jenny."  Minor appears happy and comfortable in placement with her aunts and says she wants to live with them.  According to the minor's therapist, she is progressing in therapy, but she does not talk about her mother.  The report acknowledges minor "recognizes and loves her birth mother," but has developed a strong relationship with her de facto parents and "identifies them as her family."  Prospective adoptive parents have been together for 15 years and are in their early 40's.  They have always been a part of minor's life and are committed to providing her with a permanent home, love, nurturance and stability.

In regard to mother's progress during the dependency proceeding, the section 366.26 report states "she has not shown . . . that she has addressed her alcoholism."  The report notes mother "has participated and completed numerous treatment programs" during which she received glowing reports about her participation in the program, yet she relapsed after completing each program.  Mother's current program is a 12-15 month residential program, followed by a 6-12 month aftercare program.  The report opined that whereas mother does well in the program, she cannot maintain her sobriety in order to provide care and a safe home for minor.  Accordingly, the section 366.26 report recommended the court terminate mother's parental rights to free minor for adoption.

At the section 366.26 hearing held on May 9, 2013, mother's counsel contended the court should establish a guardianship rather than terminating mother's parental rights.  Asserting that minor "loves her mommy" and looks forward to her visits with mother, counsel argued guardianship would protect minor, provide permanency and preserve her

5

relationship with mother. Following argument of counsel, the court found by clear and convincing evidence that minor is adoptable and terminated mother's parental rights.

## DISCUSSION

At a permanency planning hearing, the juvenile court is charged with determining the most appropriate permanent plan of out-of-home care for a dependent child that has been unable to reunify. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) The permanency planning hearing is designed to protect a dependent child's "compelling" right "to have a placement that is stable, permanent, and allows the caretaker to make a full emotional commitment to the child." (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1320 (*In re A.A.*).) As the most permanent of the available options, adoption is the plan preferred by the Legislature. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) Thus, if a court finds that a child is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds a "compelling reason for determining that termination would be detrimental to the child" due to one or more of the circumstances specified by statute. (§ 366.26, subd. (c)(1)(B); see also *In re A.A., supra,* at p. 1320.)

At issue here is the "beneficial relationship" exception (see § 366.26, subd. (c)(1)(B)(i)), which involves a two-part test to determine whether: (1) the parent maintained regular visitation and contact with the child; and (2) the child would benefit from continuing the relationship. For the exception to apply, "the parent-child relationship [must] promote the well-being of the child to such a degree that it outweighs the well-being the child would gain in a permanent home with new, adoptive parents. [Citation.] A juvenile court must therefore: 'balance . . . the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1342; see also *In re Autumn H., supra,* 27 Cal.App.4th at p. 575 [the beneficial

6

relationship exception applies if the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents"].)

The parent bears the burden of establishing the existence of the beneficial relationship exception. (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 731.) To meet the burden of proof necessary for the exception to apply, "the parent must show more than frequent and loving contact or pleasant visits . . . [since] '[i]nteraction between natural parent and child will always confer some incidental benefit to the child. . . . [Citation.]' [Instead,] the parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment from child to parent. [Citations.]" (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 953–954.)

Case law is divided as to the correct standard of review of an order determining the applicability of a statutory exception to termination of parental rights. (See *Autumn H., supra,* 27 Cal.App.4th at p. 576) [applying the substantial evidence standard]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*) [applying the abuse of discretion standard]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621–622 [applying substantial evidence standard to whether the beneficial parent-child relationship exists; applying abuse of discretion standard to whether that relationship provides a compelling reason to apply the exception].) However, the "practical differences" among these standards of review are not significant. (*Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) Moreover, given the analytical framework described above, we cannot say that the juvenile court erred under any of these standards by refusing to apply the beneficial relationship exception in this case.

In this regard, the parties do not dispute mother maintained enough regular contact with minor to satisfy the first part of the two-part test. However, mother failed to establish that continuing the mother-daughter relationship "outweighs the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Lorenzo C., supra,* 54 Cal.App.4th at p. 1342; *In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) First, at the time of the permanency planning hearing in May 2013, minor was only six

7

years old and had been living continuously with the prospective adoptive parents since being taken into protective custody almost 17 months before, in December 2011. Moreover, throughout these proceedings visitation never increased in number or duration, nor progressed to overnight status—indeed mother had no visits with minor from September until November 29, 2012 and, thereafter, had one visit per month under the Teen Challenge program. Under such circumstances—where mother was not providing for minor's needs in any sustained way—the juvenile court could reasonably conclude mother was not occupying a "parental role" in minor's life. (*In re L. Y. L., supra,* 101 Cal.App.4th at p. 954.)

Further, whereas mother presented evidence the minor called her "mom," appeared excited at visiting with "mom," and during visits mother and daughter were affectionate towards each other, there was also evidence that continuing contact with mother was not wholly positive. For example, the minor identified her "family" as comprising herself and her caregivers; minor did not discuss mother with her therapist and the social worker testified that when the subject of her mother comes up minor "becomes quiet" and seems sad. Also, minor's caregivers reported that during supervised visits with mother, the minor's behavior "regressed, [and] she became more 'babyish.' "

Also, mother argues the parent/child bond she shared with minor evidences the kind of relationship envisioned by the beneficial relationship exception as discussed in *In re Amber M.* (2002) 103 Cal.App.4th 681 (*Amber M.*). The *Amber M.* court, noting mother "visited as often as she was allowed and acted in a loving, parental role with the children, . . . was devoted to them and did virtually all that was asked of her to regain custody," concluded the juvenile court erred by declining to apply the beneficial relationship exception. (*Id.* at pp. 690–691.) In *Amber M.,* however, a psychologist who conducted a two-hour bonding study testified it would be detrimental to sever Amber's relationship with her mother. (*Id.* at p. 689.) Here, by contrast, mother presented no expert evidence that severing minor's relationship with her would be detrimental to minor, nor did she do "all that was asked of her to regain custody" (*id.* at p. 690), because

even by the time of the permanency hearing she had not managed to maintain her sobriety outside of a treatment setting.

## DISPOSITION

The juvenile court's order terminating mother's parental rights is affirmed.

_____
Becton, J.*

We concur:

_____
Dondero, Acting P.J.

_____
Banke, J.

* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

9